# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**PATRICIA PIMENTEL, on behalf of herself** )
**and all others similarly situated,**      )
                                        )
      **Plaintiff,**                )    **Civil Action No.**
                                        )    **17-11921-FDS**
      **v.**                       )
                                        )
**CITY OF METHUEN, et al.,**                )
                                        )
      **Defendants.**               )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This is a civil rights action arising out of the use of an incorrect Spanish-language advice-of-rights form by the Methuen Police. Plaintiff Patricia Pimentel is a citizen of the Dominican Republic who illegally immigrated to the United States in 2003. She was arrested for drunk driving on October 21, 2014. After she was arrested, she was given an advice-of-rights form in Spanish, her native language.

The Spanish version of the form included incorrect information; for example, it stated that the legal limit for blood alcohol content ("BAC") while driving was 0.10 percent (it was actually 0.08 percent) and that a jury would be informed of her refusal to take a breathalyzer test (it would not). She was then given a separate "Statutory Rights and Consent Form" that correctly stated her rights. She then submitted to a breathalyzer test, which revealed her BAC to be 0.25 percent, more than three times the legal limit.

Pimentel eventually received a continuance without a finding ("CWOF") after admitting

to sufficient facts to one count of operating under the influence ("OUI") and two counts of leaving the scene of an accident causing property damage. That disposition, however, caused her immigration problems; she had previously qualified for protection under the Deferred Action for Childhood Arrivals ("DACA") program, and the CWOF jeopardized that status.

After securing new counsel, Pimentel was able to obtain a new trial on the ground that her prior counsel had rendered ineffective assistance. In its order, the state court stated that the breathalyzer test likely would have been suppressed because the incorrect advice-of-rights form coerced her consent. Prosecutors then agreed to dismiss one of the property-damage charges and the remaining charges were resolved in a manner that did not threaten her immigration status.

Pimentel has now brought suit against the City of Methuen, the Methuen Chief of Police, three police officers, and the Essex County District Attorney. Defendants have moved to dismiss the complaint for failure to state a claim. For the following reasons, the motion will be granted in part and denied in part.

## I.  Background

### A.  Factual Background

The facts are set forth as described in the complaint and attached exhibits.

#### 1.  Events Leading Up to Pimentel's Arrest

Patricia Pimentel is a citizen of the Dominican Republic. (Compl. ¶ 80). Her primary language is Spanish. (*Id.* ¶ 99).

In 2003, when Pimentel was nine years old, her parents paid a "coyote" (that is, a smuggler) to bring her illegally into the United States. (*Id.* ¶ 81). After arriving in the United States, she attended public schools in Lawrence, Massachusetts. (*Id.* ¶ 83). She graduated from Lawrence High School in 2013. Although she hoped to enroll in college to study criminal

justice, her status as an illegal immigrant precluded her from qualifying for certain forms of financial aid.  (*Id.* ¶ 84).

On June 15, 2012, then-President Obama announced the creation of the Deferred Action for Childhood Arrivals program, or DACA.  (*Id.* ¶ 85).  Among other things, DACA provided that the federal government would not pursue immigration action against illegal immigrants who were brought to the United States as minors, provided they were not convicted of serious crimes or otherwise posed a threat to public safety.  (*Id.* ¶ 86).  The program allowed qualified individuals to seek employment and higher education opportunities legally.  (*Id.* ¶ 87).

Pimentel applied for DACA status on May 14, 2013, and her application was granted. (*Id.* ¶ 88).  She then began working in the packaging department at JMB Industries in Hudson, New Hampshire.  (*Id.* ¶ 89).

On the evening of October 21, 2014, Pimentel and two of her friends were drinking.  (*Id.* ¶ 91).  Pimentel was 20 years old at the time, and therefore under the legal drinking age.  (*Id.*). She became ill from the alcohol and called a taxi to bring her home.  (*Id.* ¶ 92).  One of her friends offered to drive her home instead in Pimentel's car.  (*Id.*).  That friend then got into an argument with her husband over the phone while driving, and pulled up to her own home rather than Pimentel's.  (*Id.* ¶ 93).  Pimentel remained in the car in the driveway.  (*Id.*).

According to the complaint, Pimentel then saw her ex-boyfriend sitting in a nearby car. (*Id.* ¶ 94).  He called her cell phone, and an argument ensued.  (*Id.* ¶¶ 95-96).  During the conversation, she asked the boyfriend to stop following her, and he replied that he was going to "fuck [her] up."  (*Id.* ¶ 96).  After the boyfriend started walking towards her car, she panicked, moved into the driver's seat and began driving away.  (*Id.*).  She hit two nearby parked vehicles. (*Id.* ¶ 97).

A short pursuit ensued, and the boyfriend cut her off at a stop sign.  (*Id.*).  He opened the driver's door to Pimentel's vehicle and hit her in the face.  (*Id.*).  At that point, the boyfriend heard police sirens and fled the scene.  (*Id.* ¶ 98).

Methuen police officers Shawn Tardiff and David Souther were the first to arrive.  (*Id.* ¶ 99).  Tardiff asked Pimentel for her license and registration and began to question her.  (*Id.*).  Shortly afterward, a Spanish-speaking officer, Elvin Alacron, pulled up and joined in the questioning, because she preferred to have an interpreter present.  (*Id.*).

Tardiff and Alacron then asked Pimentel to perform various field sobriety tests.  (*Id.* ¶ 100).  After concluding she was driving while under the influence of alcohol, they arrested her and transported her to the Methuen police station.  (*Id.*).

### 2.      Pimentel is Given the Incorrect OUI Advice-of-Rights Form

Once at the police station, Pimentel was observed for 15 minutes by Alacron and Lieutenant James Jajuga, who was the booking officer.  (*Id.* ¶ 101).  After the observation period, Pimentel was given the Spanish-language version of the Methuen Police advice-of-rights form given to persons arrested for OUI.  The Spanish version included multiple incorrect statements of law.  (*Id.* ¶ 35).[1]

First, the form stated that if OUI arrestees refused to consent to a breathalyzer test, the jury would be informed of that refusal.  (*Id.* ¶ 36; Ex. 6).  However, the Supreme Judicial Court had held in 1992 that such an instruction would violate a defendant's right against self-incrimination.  (*Id.* ¶ 37).

Second, the form stated that if the breathalyzer test results showed a BAC of 0.10 percent or more, "it is presumed that you are driving under the influence of intoxicating liquor, and this

---

[1] Exhibit 6 to the complaint is a proposed English translation of the Spanish advice-of-rights form.

proof can be used as evidence against you in court." (*Id.* ¶ 38; Ex. 6). The form further stated that "the court will suspend your license for a period of time up to 90 days." (*Id.*). However, the legal BAC level is 0.08 percent, not 0.10 percent, and the license-suspension penalty for registering a BAC of 0.08 percent or higher is capped at 30 days, not 90. (*Id.* ¶ 39). The complaint further alleges that the form omitted any mention of the "per se" theory of liability, under which the state can convict a defendant of OUI simply by showing that the defendant drove with a BAC higher than 0.08 percent. (*Id.*).

Third, the form stated that if the breathalyzer test showed a BAC higher than 0.05 percent but lower than 0.10 percent, "there is no presumption that you are driving under the influence of an intoxicating liquor." (*Id.* ¶ 40; Ex. 6). Again, the legal BAC level is 0.08 percent. (*Id.* ¶ 41).

Fourth, the form stated that if the breathalyzer test result showed a BAC of 0.05 percent or lower, the arrestee would be "liberated" or "set free" from the charge. (*Id.* ¶ 42; Ex. 6). Although a BAC of 0.05 percent or lower creates a "permissible inference that such defendant was not under the influence of intoxicating liquor," a defendant can still be prosecuted for an OUI if there is other evidence of impairment. (*Id.* ¶ 43). The form also did not include information specific to drivers under the age of 21—specifically, that Massachusetts subjects such drivers to certain penalties if their BAC is 0.02 percent or more. (*Id.*).

Fifth, the form stated that a refusal to submit to the breathalyzer test would result in a 120-day suspension of the arrestee's driver license. (*Id.* ¶ 44; Ex. 6). However, the penalty for refusing a breathalyzer test is a mandatory 180-day license suspension for drivers aged 21 or over, and a mandatory three-year license suspension for drivers under age 21. (*Id.* ¶ 45).

After reviewing the Spanish advice-of-rights form, Pimentel signed the document a few minutes after 2 a.m. on October 22. (*Id.* ¶ 103; Ex. 5). She was then given a "Statutory Rights

and Consent Form" that listed further rights in both Spanish and English, which she also signed. (*Id.* ¶ 105; Ex. 11).  The parties do not dispute that the Statutory Rights and Consent Form correctly stated her rights.  After signing both forms, Pimentel took the breathalyzer test, which showed her BAC to be 0.25 percent.  (*Id.* ¶ 108).

### 3.    Subsequent Criminal Proceedings

Later that day, Pimentel was arraigned on one count of OUI and two counts of leaving the scene of an accident causing property damage.  (*Id.* ¶ 109).  She received a court-appointed attorney and discussed her immigration status with him.  (*Id.* ¶ 110).  She asked her attorney whether she could obtain a CWOF and how the proceedings would affect her immigration status. (*Id.* ¶ 112).  The attorney replied that a CWOF would not constitute an adjudication of guilt, preserving her DACA status.  (*Id.* ¶ 113).

On January 6, 2015, Pimentel pleaded to sufficient facts, and a district court judge continued the matter without a finding for one year.  (*Id.* ¶ 114).  As a consequence of the plea, she lost her license for 210 days.  (*Id.*).  She was placed on probation, and was required to complete a 14-day inpatient alcohol treatment program.  (*Id.*).  In addition, near the end of her probation period, she was informed she had to participate in a 16-week first-time-offender alcohol-education program.  (*Id.*).  The district court continued her probation four months so she could complete the program.  (*Id.*).

On April 30, 2015, Pimentel applied to renew her DACA status and employment authorization, which were set to expire on May 13, 2015.  (*Id.* ¶ 115).  Approximately four months later, on September 7, 2015, she received two letters from the Department of Homeland Security denying her applications.  (*Id.* ¶ 116).  The letters stated that the applications were denied because she had been convicted of "a felony or a significant misdemeanor."  (*Id.*; Exs. 13

and 14).  Without the protection of DACA, she was potentially subject to deportation to the

Dominican Republic.  (*Id.* ¶ 118).

Pimentel then sought new counsel.  (*Id.* ¶ 119).  At some point in December 2015, she

learned that the Spanish version of the advice-of-rights form had included incorrect information.

(*Id.* ¶ 120).  On July 26, 2016, her attorney moved for a new trial on the ground of ineffective

assistance of counsel—specifically, that her prior plea was constitutionally invalid because her

prior counsel had failed to advise her of the consequences to her immigration status and did not

explore a motion to suppress the breathalyzer test evidence.  (*Id.* ¶ 121).  The motion was granted

on March 2, 2017.  (*Id.* ¶ 122).  A state district court judge agreed that her prior counsel had

provided ineffective assistance and that she stood a reasonable chance of suppressing the

breathalyzer test evidence.  (*Id.*; Ex. 4).

Approximately two months later, the district attorney's office agreed to dismiss one of

the property-damage charges.  (*Id.* ¶ 124).  In addition, the assistant district attorney agreed to a

"guilty-filed" disposition of the remaining charges, which would not threaten Pimentel's

immigration status.  (*Id.* ¶¶ 124-25).

### 4. Methuen's Alleged Awareness of Errors in the Advice-of-Rights Form

On August 12, 2012—more than two years before Pimentel was arrested—another

Spanish-speaking individual had been arrested in Methuen for operating under the influence.

That individual was given a Spanish-language advice-of-rights form identical to the one Pimentel

received.  (*Id.* ¶ 50).  That individual similarly moved to suppress his breathalyzer test results.

(*Id.*).  On May 9, 2013, Assistant District Attorney Lindsay Nasson conceded the motion to

suppress, and the individual was eventually acquitted.  (*Id.* ¶ 51).

On May 10, 2013, Nasson e-mailed her superiors explaining why she conceded the

motion to suppress—specifically, that the Spanish-language advice-of-rights form included incorrect statements of law. (*Id.* ¶ 52). The e-mail stated that "I just wanted to put everyone on notice that this is a live issue, and something that we will be working with [the] Methuen [Police Department] to rectify." (*Id.* ¶ 54). The complaint implies, but does not explicitly state, that Nasson ultimately followed through and communicated her concerns to the Methuen Police Department. It alleges that the Methuen police continued using the incorrect advice-of-rights form at least through November 2016, and that "even high-ranking police officers . . . were completely unaware" of the situation. (*Id.* ¶ 60).

Pimentel's counsel submitted Freedom of Information Act ("FOIA") requests "pertaining to the use of an erroneous Spanish language form previously used by the Methuen Police Department in connection with [OUI] cases." (*Id.* Exs. 2, 3). The Essex County District Attorney's Office identified two cases, one from 2012 and one from 2014, in which the incorrect advice-of-rights form was used. (*Id.* Ex. 3). The Essex County District Attorney's Office also provided counsel a list of possible Hispanic OUI defendants who may have been given that form. (*Id.*). Ultimately, the District Attorney's Office identified approximately 300 defendants who may have received the erroneous form. (*Id.* ¶ 129). However, the city and District Attorney were unable to locate many requested records, such as "[a]ll records and communications related to any complaint about the Rights Form" and "[a]ll records and communications reflecting the identity of any person(s) who drafted, edited, revised or approved the Rights Form." (*Id.* Ex. 3).

### B.    Procedural Background

On October 5, 2017, Pimentel brought suit against the City of Methuen, Methuen Police Chief Joseph Solomon (in his individual and official capacities), Officers Jajuga, Alacron, and Tardiff (in their individual capacities), and Jonathan Blodgett, the Essex County District

Attorney (in his official capacity). The complaint contains 11 counts. Count 1 asserts a claim under 42 U.S.C. § 1983 for violations of Fourteenth Amendment substantive-due-process rights; Count 2 asserts a claim under 42 U.S.C. § 1983 for violations of Fourteenth Amendment procedural-due-process rights; Count 3 asserts a claim under 42 U.S.C. § 1983 for violations of Fourteenth Amendment equal-protection rights; Count 4 asserts a violation of 42 U.S.C. § 1981; Count 5 asserts a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, by the City of Methuen; Count 6 asserts violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H & 11I; Count 7 asserts a claim for substantive-due-process violations under the Massachusetts Declaration of Rights; Count 8 asserts a claim for procedural-due-process violations under the Massachusetts Declaration of Rights; Count 9 asserts a claim for equal-protection violations under the Massachusetts Declaration of Rights; Count 10 asserts a claim for intentional infliction of emotional distress against the individual police defendants; and Count 11 purports to reserve the right to amend the complaint to bring further tort claims. The complaint seeks class-action certification, damages, and various forms of equitable relief.

Defendants have moved to dismiss the complaint for failure to state a claim and to dismiss all claims against the individual defendants on the basis of qualified immunity.

## II.  Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555

(citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the

complaint fails to set forth "factual allegations, either direct or inferential, respecting each

material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v.*

*Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano*

*de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III. Analysis

#### A. Count 1—Substantive Due Process

Count 1 asserts a claim under 42 U.S.C. § 1983 for substantive-due-process violations

against all defendants. Section 1983 "creates a private right of action for redressing

abridgements or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29,

33 (1st Cir. 1995). "A claim under § 1983 has two 'essential elements': the defendant must

have acted under color of state law, and his or her conduct must have deprived the plaintiff of

rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306

(1st Cir. 2008). The second element requires the plaintiff to show that the defendants caused the

alleged deprivation. *Id.*

The parties do not dispute that defendants were acting under color of state law. As to the

second element, the complaint alleges that defendants "adopted, implemented, enforced,

condoned, sanctioned, acquiesced to, and encouraged a policy, pattern, practice, or custom of

violating the clearly established due process rights of the Class Members by using the erroneous

. . . Spanish language advice of rights form . . . ." (Compl. ¶ 143). The complaint further

appears to allege that it was the City's policy or custom to maintain usage of the incorrect form. It also alleges that defendants' conduct was "intentional, wanton, malicious, reckless, callously indifferent, and oppressive." (*Id.* ¶ 150).

To constitute a violation of substantive due process, state action must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any government interest.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005) (quoting *Lewis*, 523 U.S. at 849). By contrast, "negligently inflicted harm is 'categorically beneath the threshold' of a constitutional violation." *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 53 (1st Cir. 2006) (quoting *Lewis*, 523 U.S. at 849).

Situations where the alleged wrongdoing amounted to "deliberate indifference" present "closer calls." *Id.* The First Circuit has cautioned that "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior *may* suffice to shock the conscience." *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005) (emphasis added). However, "[t]hat determination . . . is context specific" and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Ramos-Pinero*, 453 F.3d at 53.

Whether defendants' failure to cure the defective advice-of-rights form could amount to conduct that "shocks the conscience" is far from clear. Assuming that the allegations of the complaint are true, municipal officials in Methuen were obviously negligent in failing to correct the form; however, negligence is not enough. The complaint alleges that the conduct was "intentional," but in largely conclusory terms; the issue seems likely to turn on whether plaintiff

can show deliberate indifference.

Because deliberate indifference is a context-dependent inquiry, the Court will err on the side of caution, and permit the substantive-due-process claim to go forward at least to the summary-judgment stage. That will permit the development of a factual record, and a resolution of the question based on the evidence. Whether the facts, as opposed to the allegations of the complaint, amount to conduct so egregious as to shock the conscience is a question for another day.[2] Accordingly, defendants' motion to dismiss will be denied as to Count 1.

## B. Count 2—Procedural Due Process

Count 2 asserts a claim under 42 U.S.C. § 1983 for procedural-due-process violations against all defendants. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972); *see also Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 56 (1st Cir. 2006). Analysis of an alleged violation of procedural-due-process rights requires two steps: "[w]e first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

The parties do not dispute that provision of the incorrect advice-of-rights form resulted in a deprivation of a liberty interest. The question is thus whether the process she received was sufficient.

Plaintiff primarily focuses her argument on the fact that "she did not knowingly, intelligently, and voluntarily enter the initial plea agreement" because she did not consent to the

---

[2] Indeed, a state judge concluded that "[f]rom all indications, the incorrect rights form was more likely the result of negligent Spanish interpretation and oversight by the Methuen Police Department than any pernicious government misconduct. [Pimentel's] affidavit fails to make any substantial evidentiary showing of any egregious misconduct by the government." (Compl. Ex. 4 at 7).

breathalyzer test.  (Mem. in Opp. at 9).  But after securing new counsel, she was able to identify

problems in the Spanish advice-of-rights form.  The district court granted her a new trial, and she

ultimately agreed to a "guilty-filed" disposition.  Under the circumstances, it is clear that plaintiff

was afforded adequate process—indeed, the state court agreed with her argument that the

incorrect advice-of-rights form likely vitiated her consent, and granted her relief.  Because a

"procedural due process claim is not actionable, unless, inter alia, no adequate 'post-deprivation

remedy' is available under state law," plaintiff's procedural-due-process claim must fail.  *Perez-

Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994); *see also Herwins v. City of Revere*, 163

F.3d 15, 19-20 (1st Cir. 1998) (stating that administrative error did not constitute a due process

violation where plaintiff could have appealed to state courts).

Therefore, there was no procedural-due-process violation, and defendants' motion to

dismiss will be granted as to Count 2.  Because Count 8 asserts an analogous claim under the

Declaration of Rights, it too will be dismissed.  *See Lopes v. Beland*, 2016 WL 4148190, at *9

(D. Mass. Aug. 4, 2016) ("[W]here, as here, a plaintiff does not argue that the Declaration of

Rights affords him greater protection, the [federal and state constitutional] claims are treated

identically.").

C.     **Count 3—Equal Protection**

Count 3 asserts a claim under 42 U.S.C. § 1983 for equal-protection violations against all

defendants.  The Equal Protection Clause of the Fourteenth Amendment generally provides that

similarly situated persons are entitled to receive similar treatment at the hands of government

actors.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To state an

equal-protection claim, a plaintiff must show that she "was treated differently from others

similarly situated . . . based on impermissible considerations."  *Clark v. Boscher*, 514 F.3d 107,

114 (1st Cir. 2008) (citation and quotation marks omitted).  The Supreme Court has held that differential treatment based on suspect classifications (race, national origin, religion, or alienage) is subject to strict scrutiny; differential treatment based on quasi-suspect classifications (gender or illegitimacy) is subject to intermediate scrutiny; and differential treatment based on all other classifications must simply survive a rational-basis inquiry.  *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (collecting cases).  In addition, a plaintiff must plead sufficient facts such that it is plausible that a defendant acted with discriminatory intent.  *See Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) ("[U]nless these plaintiffs established the requisite discriminatory intent, their equal protection claim cannot succeed . . . .").

Defendants contend that the allegations in the complaint are not sufficient to suggest that their purported misconduct was intentional.  *See City of Cuyahoga Falls, Ohio v. Buckeye Comm. Hope Foundation*, 538 U.S. 188, 194 (2003) (stating that "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause") (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977)) (quotation marks omitted).  Again, the complaint alleges that the conduct of various Methuen police officers and officials was "intentional, wanton, malicious, reckless, callously indifferent, and oppressive."  (Compl. ¶ 173).  The complaint also alleges that defendants continued using the incorrect form for at least 17 months after ADA Nasson's e-mail in May 2013.  (*Id.* ¶ 56).[3]  For purposes of a motion to dismiss, that is sufficient to allege intentional conduct for a § 1983 claim under the equal-protection clause.  Whether those allegations are true

---

[3] Plaintiff also points to the fact that the city and Essex County District Attorney's Office did not produce all requested documentation in response to a FOIA request.  (Mem. in Opp. at 15).  That allegation carries little weight in this context.  When voluminous records are sought, as was the case here, it is frequently difficult to produce all requested documents, particularly within a short time period.

must, of course, await development of a factual record.

Defendants further contend that the putative class of plaintiffs identified in the complaint are "Spanish-speaking" individuals rather than Hispanics, and that "membership in a group of persons unable to read English . . . does not constitute a suspect classification . . . ." (Mem in Supp. at 9). In support, defendants cite two cases from the Supreme Judicial Court: *Commonwealth v. Acen*, 396 Mass. 472, 479-80 (1986) (stating "those who are unable to read English are not a suspect class under the equal protection clause") and *Commonwealth v. Olivo*, 369 Mass. 62, 72 (1975) ("The class burdened, however, is not those of Spanish descent, but those unable to read English. This is not a suspect class.").[4]

As a general proposition, those cases are correct: language (or language facility) is not a suspect classification. However, it is at least possible, under some circumstances, that language could be a surrogate for national origin. In *Hernandez v. New York*, 500 U.S. 352 (1991), Justice Kennedy, writing for a plurality, cautioned that "[i]t may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Id.* at 371. State and federal courts in recent years have struggled with this issue. *See, e.g.*, *People v. Aviles*, 28 N.Y.3d 497, 509-10 (2016) (noting "our nation's understanding of the role language plays in our multiethnic society has evolved" over the past three decades); *State v. Gould*, 322 Conn. 519, 536-37 (2016) (declining to address whether language restrictions are pretexts for unlawful discrimination based on race or national origin); *Kikumura v. Turner*, 28 F.3d 592, 599 (7th Cir. 1994) (same).

---

[4] *Acen* involved the exclusion of non-English speakers from juries, a classification subject to rational-basis scrutiny because it fell within the "political function exception." *Acen*, 396 Mass. at 481. *Olivo* involved the posting of criminal complaints in English to Spanish-speaking defendants. 369 Mass. at 65. In *Olivo*, the SJC stated that because "[t]his is not an officially multilingual country, [ ] notification of official matters in the sole language of both this nation and this Commonwealth is patently reasonable." *Id.* at 73.

The problem here is that the complaint does not explicitly allege that language was used as a proxy for national origin. Indeed, it does not even allege an act of unlawful discrimination against a Hispanic on the basis of national origin. Instead, it alleges that "English-speaking and non-Hispanic individuals have been treated differently than Spanish-speaking Hispanic individuals arrested in Methuen for OUI matters . . . ." (Compl. ¶ 165). Thus, the complaint is at best ambiguous as to whether the alleged improper classification is based on language—namely, the treatment of those arrestees who speak English (whether or not they are Hispanic) and those who speak Spanish—or national origin.

However, the equal-protection claim survives a motion to dismiss either way. If the classification is language-based, it is subject to rational-basis scrutiny. *Clark*, 486 U.S. at 461. There is no apparent rational basis for providing accurate information to OUI arrestees in English and grossly inaccurate information to similar arrestees in Spanish. And, of course, if the classification is race-based, it fails the even more stringent strict-scrutiny test. *Id.*

The equal-protection claim is therefore sufficiently plausible to survive a motion to dismiss. Again, whether defendants acted knowingly and intentionally, rather than out of neglect or mistake, is a question that can only be answered after discovery and development of the record. Accordingly, defendants' motion to dismiss will be denied as to Count 3.

### D.      Count 4—Civil Rights Claims under 42 U.S.C. § 1981

Count 4 asserts a claim under 42 U.S.C. § 1981.[5] Section 1981 guarantees "equal rights under the law." 42 U.S.C. § 1981. It "prohibits both public and private racial discrimination in certain specified activities." *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002). One such specified activity is the ability to enjoy "the full and equal benefit of all laws and proceedings for

---

[5] Apparently in error, the complaint also cites 42 U.S.C. § 1983 in the heading for Count 4.

the security of persons and property." 42 U.S.C. § 1981. To prove a violation under § 1981, "a plaintiff must show (1) that [she] is a member of a racial minority; (2) that the defendant[s] discriminated against [her] on the basis of race; and (3) that the discrimination implicated one or more of the activities enumerated in the statute." *Garrett*, 295 F.3d at 98. Furthermore, the discrimination must be purposeful. *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (holding that § 1981 "can be violated only by purposeful discrimination").

However, § 1981 only protects a limited range of civil rights, such as the right to make and enforce contracts. *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[W]e have explained that [§ 1981] was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.") (citation and quotation marks omitted); *see also Garrett*, 295 F.3d at 98. There is no obvious application of § 1981 to this case.

Nevertheless, because the parties did not substantively address this claim in their briefs, Count 4 will remain pending.

### E.   Count 5—Title VI of the Civil Rights Act of 1964

Count 5 asserts a claim for violation of Title VI of the Civil Rights Act of 1964 against the City of Methuen. Section 601 of the Civil Rights Act provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d. The Supreme Court has construed section 601 to create a private right of action for individuals to enforce Title VI and obtain injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001). The parties do not dispute that the City of Methuen, as a recipient of federal funding, is subject to Title VI.

The parties again dispute whether the complaint has sufficiently pleaded a claim of discrimination. *See id.* at 280 ("It is similarly beyond dispute . . . that § 601 prohibits only intentional discrimination."); *see also Alexander v. Choate*, 469 U.S. 287, 293 (1985) ("Title VI itself directly reach[es] only instances of intentional discrimination."); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287 (1978). Count 5, unlike Count 3, does not allege discrimination on the basis of language; instead, it alleges that the "use of the unlawfully coercive Spanish language advice-of-rights form in connection with arrests and prosecutions of Spanish-speaking Hispanic individuals for OUI matters in Methuen discriminates against individuals based on their race, color, or national origin . . . ." (Compl. ¶ 191). That language, in context, is sufficient to allege a claim of discrimination based on national origin. The motion to dismiss Count 5 will accordingly be denied.

## F. Count 6—Massachusetts Civil Rights Act

Count 6 asserts a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H & 11I. The MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion." Mass. Gen. Laws ch. 12, § 11I. A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in fear for the purposes of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994). "[T]he MCRA contemplates a two-part sequence: [liability may be found where] (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that

[she] has the constitutional right to do." *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).

The SJC has not yet decided whether municipalities may be liable under the MCRA. However, the Appeals Court has held that "a municipality is not a 'person' covered by the [MCRA]." *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 591-92 (2001). That holding has been followed in federal court. *See, e.g.*, *Kelley v. LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002); *Dyer v. City of Boston*, 2018 WL 1513568, at *7 (D. Mass. Mar. 27, 2018); *Meagher v. Andover School Committee*, 94 F. Supp. 3d 21, 45 (D. Mass. 2015). Accordingly, the MCRA claim against the City of Methuen will be dismissed.

Defendants further contend that the MCRA claims against the individual defendants should also be dismissed because none of them are personally alleged to have used threats, intimidation, or coercion to make plaintiff take the breathalyzer test. In her opposition, plaintiff alleges that because Officers Jajuga, Tardiff, and Alacron all observed or interacted with her at the police station, they "were involved in the coercive conduct that violated her rights." (Mem. in Opp. at 16). At the very least, there is a question as to whether any of the individual defendants were aware that plaintiff was being given the incorrect form such that their conduct could be said to be "coercive." Therefore, the motion to dismiss the MCRA claim against the individual defendants will be denied.

G. **Counts 7, 8, and 9—Right of Action under the Massachusetts Declaration of Rights**

Defendants separately contend that Counts 7, 8, and 9, which are claims under the Massachusetts Declaration of Rights, should be dismissed.[6]

_____

[6] The Court has already concluded that Count 8 should be dismissed based on the failure to plead an adequate procedural due-process violation.

Defendants first argue that the MCRA "occupies the field" and bars any direct claim under the Declaration of Rights, provided the state actor used threats, intimidation, or coercion to deprive a plaintiff of her state constitutional rights. At least one federal court has so held. *See Do Corp. v. Town of Stoughton*, 2013 WL 6383035, at *13 (D. Mass. Dec. 6, 2013). That decision was based on the following language in *Martino v. Hogan*, 37 Mass. App. Ct. 710, 720 (1994):

> There has been discussion of grounding a cause of action on the State Constitution for violation of its provisions where no statutory avenue for enforcement has been fashioned and made available. No actual decision on that line has reached the present situation or anything near it. To be considered before such a step is taken is the fact of the existence of § 1983 and the State analogue, [the MCRA]: these may be thought, as it were, to occupy the field.

(citations omitted). That language appears to be dicta, however, and does not appear to have been followed by any state court. In any event, this Court need not reach the issue, because there is insufficient state-law authority to support such a claim.

The SJC has never held that there is a right of action to enforce the Declaration of Rights. It did suggest, 35 years ago, in dicta, that such a right "may" be available. *See Phillips v. Youth Dev. Program, Inc.*, 390 Mass. 652, 657-58 (1983) (stating that "a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief"). Six years later, it made a similar observation. *See Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction*, 406 Mass. 156, 159-60 (1989) (stating that "a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights").

Many years later, the Massachusetts Appeals Court, in dicta in an unpublished opinion, noted that "because Massachusetts has not definitively determined whether a cause of action can

be brought based solely on the Declaration of Rights, we must look to the Federal standards in reviewing [plaintiff's] claim." *Cormier v. City of Lynn*, 2017 WL 121065, at *3 (Mass. App. Ct. Jan. 12, 2017). But that opinion simply assumed that such an action could be brought, and then concluded that no constitutional violation had occurred.

Based on that language, and a single Superior Court decision, at least one federal court has concluded that a direct right of action exists under Massachusetts law to enforce the Declaration of Rights. *See Podgurski v. Dep't of Corr.*, 2014 WL 4772218, at *7 (D. Mass. Sep. 23, 2014) ("[T]he Court agrees . . . that as a general proposition, a cause of action can, in certain circumstances, be brought directly under the Massachusetts Declaration of Rights in the absence of a statutory vehicle for obtaining relief.") (citing *Parsons ex. rel. Parsons v. Town of Tewksbury*, 2010 WL 1544470, at *4 (Mass. Super. Ct. Jan 19, 2010)).

This Court is of a different view. No Massachusetts appellate court, in the 35 years since *Phillips*, has ever held that such a right exists. And it is emphatically not the role of the federal courts to develop and expand upon state law. If this Court were to conclude that such a right existed, no Massachusetts court would have an opportunity to consider that decision—including, among other things, an opportunity to consider the wisdom of the policy embedded in such a decision and the potential consequences for litigants and the courts. It is up to the courts of Massachusetts, not this Court, to make that choice. Counts 7, 8, and 9 will therefore be dismissed.

**H**      **Count 10—Intentional Infliction of Emotional Distress**

Count 10 asserts a claim for intentional infliction of emotional distress against the individual defendants. To state a claim for IIED under Massachusetts law, a complaint must allege:

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of his conduct; (2) that
> the conduct was extreme and outrageous, was beyond all possible bounds of
> decency[,] and was utterly intolerable in a civilized community; (3) that the
> actions of the defendant were the cause of the plaintiff's distress; and (4) that the
> emotional distress sustained by the plaintiff was severe and of a nature that no
> reasonable man could be expected to endure it.

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976) (citations and internal quotation

marks omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995). Courts apply a

"very high" standard to claims of intentional infliction of emotional distress, especially on the

requirement that the conduct in question is extreme and outrageous, beyond all possible bounds

of decency in a civilized community. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir.

1996). "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances,

petty oppressions, or other trivialities.'" *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987)

(quoting Restatement (Second) of Torts § 46, cmt. d (1965)).

Even if defendants' conduct violated plaintiff's civil rights, that does not "necessitate a

finding that the conduct is sufficiently egregious to state a claim for [IIED]." *Guckenberger v.*

*Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing *Marques v. Fitzgerald*, 99 F.3d 1, 6-

7 (1st Cir. 1996)). Here, the complaint has pleaded sufficient facts creating a plausible inference

that the individual defendants were aware of errors in the advice-of-rights form and nevertheless

proceeded to give it to plaintiff. If true, that could potentially constitute the "profoundly

shocking conduct" necessary for an IIED claim. *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8

(1994). Therefore, the motion to dismiss will be denied as to Count 10.

## I. Count 11—"Reservation of Right to Amend Complaint"

Count 11 merely purports to reserve the right to amend the complaint to bring additional

claims under the Massachusetts Tort Claims Act. It does not provide a "short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, defendants' motion to dismiss will be granted as to Count 11. To the extent plaintiff seeks to add new claims, she may file a motion to amend under Rule 15.

**J.      Qualified Immunity**

Defendants further contend that Police Chief Solomon and the other individual defendants are entitled to qualified immunity. The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has articulated a two-part test for determining qualified-immunity. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* The qualified-immunity doctrine "leaves 'ample room for mistaken judgments.'" *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

As shown above, the complaint alleges state and federal constitutional claims against the individual defendants. Based solely on the pleadings, it is uncertain whether in fact the individual defendants' conduct was objectively reasonable such that qualified immunity should apply. That question is better reserved for summary judgment after the development of a factual record. Accordingly, the Court will not dismiss the claims on the basis of qualified immunity at this stage of litigation.

### K.    Viability of *Monell* Claims

Defendants further argue that the § 1983 claims against the City of Methuen should be dismissed because the complaint fails to state a *Monell* claim.  A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents*." See Monell v. Department of Soc. Servs*., 436 U.S. 658, 694 (1978).  "[L]iability can be imposed on a local government only where that government's policy or custom is responsible for causing the constitutional violation or injury."  *See Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002) (citing *Monell*, 436 U.S. at 690-91).  Here, the complaint alleges that two general policies or customs of the city caused the constitutional violations at issue:  (1) maintenance of an unconstitutional policy, custom, or practice and (2) failure to properly train, supervise, or discipline officers.

Practices that are not officially authorized may nonetheless be actionable under *Monell* if they are "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005); *see also Monell*, 436 U.S. at 691 (informal practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law").  "The standard of causation is quite high: the municipal custom or policy must be shown to have been the 'moving force' behind the constitutional injury."  *Beal v. Blache*, 2005 WL 352861, at *2 (D. Mass. Feb. 14, 2005) (quoting *Polk County. v. Dodson*, 454 U.S. 312, 326 (1981)).

Here, the complaint states a plausible *Monell* claim.  It alleges that the city, despite being aware of the widespread use of the incorrect Spanish advice-of-rights form for 17 months, failed to rectify the practice, resulting in the violation of plaintiff's constitutional rights.

A municipality may also be liable under § 1983 for failure to train its police officers if

"that failure causes a constitutional violation or injury and 'amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact.'" *DiRico v. City of Quincy*, 404 F.3d 464, 468 (1st Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Again, the complaint alleges that Methuen failed to train its officers on the unlawful use of the Spanish advice-of-rights form after ADA Nasson alerted police officials to the form's errors. It further alleges that the individual officers should have noticed "glaringly obvious error[s]" in the form. (Mem. in Opp. at 25). Accepting these allegations as true, the complaint states a plausible *Monell* claim for failure to train.

### L.     Supervisory Liability for Police Chief Solomon

Finally, defendants contend that the complaint fails to allege a basis for supervisory liability against Police Chief Solomon under § 1983. *Respondeat superior* cannot serve as the basis for supervisor liability in an action under § 1983. *See Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996). For supervisory liability to attach, a plaintiff must show an affirmative link between the constitutional violation and the supervisor's actions and omissions, "whether through direct participation or through conduct that amounts to condonation or tacit authorization." *Camilo–Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).

> Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.

*Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir.2008) (internal citations and quotations omitted).

As noted, the complaint plausibly alleges that the individual officers violated plaintiff's constitutional rights. For supervisory liability to attach, the complaint must also plausibly allege that Solomon's action or inaction was affirmatively linked to his officers' constitutional

violations. "The requirement of an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Id.* (quoting *Hegarty v. Somerset County*, 53 F.3d 1367, 1380 (1st Cir. 1995)). This means that the supervisor's behavior must amount to "supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." *Id.* A finding of deliberate indifference requires a showing that "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Id.* (quoting *Hegarty*, 53 F.3d at 1380). Such indifference by a supervisor can be shown if the supervisor had actual knowledge of or was willfully blind to the alleged constitutional violations. *See Feliciano–Hernandez v. Pereira-Castillo*, 663 F.3d 527, 535 (1st Cir. 2011); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998). Isolated instances of unconstitutional activity are ordinarily insufficient to show deliberate indifference. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

Here, the complaint adequately pleads an "affirmative link." Making all reasonable inferences in plaintiff's favor, Police Chief Solomon was notified in May 2013 by ADA Nasson that the Spanish advice-of-rights form was incorrect. Despite the knowledge that the incorrect form was being used, Solomon allegedly took no steps to fix the form until well after plaintiff's arrest. Accordingly, the complaint states a § 1983 supervisory liability claim for "acquiescence or gross negligence amounting to deliberate indifference." *Pineda*, 533 F.3d at 54.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part. Specifically, the motion is granted as to Counts 2, 7, 8, 9, and 11; as to Count 6 against the City of Methuen; and otherwise denied.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated: June 26, 2018                United States District Judge